# 22-2505

## United States Court of Appeals
### *for the*
### Second Circuit

———

Nicholas Earl,

*Plaintiff-Appellant*,

Nurse Anonymous,

*Plaintiff*,

v.

Good Samaritan Hospital of Suffern NY, Bon Secours Charity Health System, Westchester Health Care Foundation, Inc., DBA Westcheschester Health Care Network, Inc.,

*Defendants-Appellees*,

Westchester Medical Health Foundation, Inc., Westchester County Health Care Corporation, DBA WMCHealth,

*Defendants*.

———

On Appeal from a Judgment of the United States District Court, Southern District of New York

## Reply Brief of Plaintiff-Appellant

Stephen Bergstein

Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York  12561
(845) 469-1277
Counsel for Plaintiff-Appellant

**Table of Contents**

Table of Authorities.................................................................... i

Introduction ........................................................................ 1

Point I

Plaintiff was disabled under federal law when he worked for Good Samaritan
Hospital............................................................................... 1

Point II

The SAC properly alleges that Plaintiff's post-COVID symptoms substantially
impaired major life activities...................................................... 5

    A. Plaintiff's loss of taste and smell ..................................... 5
    B. Plaintiff's inability to sleep ........................................ 8
    C. Plaintiff's brain fog, memory loss, and breathing difficulties ...... 10
    D. Plaintiff's kidney disease .......................................... 12

Point III

Plaintiff plausibly asserts that Defendant denied him a reasonable
accommodation...................................................................... 14

Conclusion......................................................................... 20

Certification..................................................................... 21

## Table of Authorities

*Anderson News LLC v. Am. Media Inc.*,
    680 F. 3d 162 (2d. Cir. 2012) ........................................................................ 3

*Batac v. Pavarini Const. Co.*,
    No. 03 Civ. 9783 (PAC), 2005 WL 2838600
    (S.D.N.Y. Oct. 27, 2005) ............................................................................. 7

*Butterfield v. New York State*,
    No. 96 Civ. 5144 (BDP) (LMS), 1998 WL 401533
    (S.D.N.Y. July 15, 1998) ........................................................................... 11

*Cain v. Mandl Coll. of Allied Health*,
    No. 14 CIV. 1729 (ER), 2017 WL 2709743 (S.D.N.Y. June 22, 2017) ...... 10

*Colwell v. Suffolk County Police Dept.*,
    158 F.3d 635 (2d Cir. 1998) ..................................................................... 8, 9

*Dancause v. Mount Morris Cent. Sch. Dist.*,
    590 Fed. Appx. 27 (2d Cir. 2014) ............................................................. 13

*Dean v. Westchester Cnty. P.R.C.*,
    309 F. Supp. 2d 587 (S.D.N.Y. 2004) ...................................................... 14

*Fiscus v. Wal-Mart Stores, Inc.*,
    385 F.3d 378 (2d Cir. 2004) ............................................................... 13, 14

*Forest City Daly Hous., Inc. v. Town of N. Hempstead*,
    175 F.3d 144 (2d Cir. 1999) ....................................................................... 6

*Gilbert v. Frank*,
    949 F.2d 637 (2d Cir. 1991) ............................................................... 13, 14

*Glaser v. Gap Inc.*,
    994 F. Supp. 2d 569 (S.D.N.Y. 2014) ........................................................ 9

*Hamilton v. Westchester County*,
    3 F.4th 86 (2d Cir. 2021) ............................................................................ 5

*Johns-Davila v. City of New York*,
No. 99 CIV 1885 (RMB) (AJP), 2000 WL 1725418 (S.D.N.Y.
Nov. 20, 2000) ............................................................................ 12

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011) .......................................................... 3

*Lawson v. CSX Transp., Inc.*,
245 F.3d 916 (7th Cir. 2001) .......................................................... 6

*Mazzocchi v. Windsor Owners, Corp.*,
204 F. Supp. 3d 583 (S.D.N.Y. 2016) ............................................ 9

*McMillan v. City of New York*,
711 F.3d 120 (2d Cir. 2013) .......................................................... 15

*Melendez v. Sirius XM Radio, Inc.*,
50 F. 4th 294 (2d Cir. 2022).......................................................... 3

*Norman v. NYU Langone Health Sys.*,
492 F. Supp. 3d 154 (S.D.N.Y. 2020)............................................ 14

*Norville v. Staten Island Univ. Hosp.*,
196 F.3d 89 (2d Cir. 1999) .................................................... 16, 17

*Parada v. Banco Industrial De Venezuela, C.A.*,
753 F.3d 62 (2d Cir. 2014) ............................................................ 9

*Rios v. Core Facility Servs. LLC*, No. 16 CV 1748 (CBA) (JO),
2018 WL 1545684, at *17 (E.D.N.Y. Mar. 29, 2018)................................ 8, 9

*Rogers v. City of New York*,
345 Fed. Appx. 201 (2d Cir. 2009) ............................................... 11

*Shields v. Robinson-Van Vuren Assocs., Inc.*,
No. 98 CIV 8785 (DLC), 2000 WL 565191
(S.D.N.Y. May 8, 2000) .................................................................. 7

*Shine v. New York City Hous. Auth.*,
    No. 19-CV-04347 (RA), 2020 WL 5604048
    (S.D.N.Y. Sept. 18, 2020) ....................................................................... 10, 11

*Sykes v. N. Fork Bank*,
    No. 07-CV-1102 (FB) (WDW), 2009 WL 5042531
    (E.D.N.Y. Dec. 16, 2009) .............................................................................. 9

*Telemaque v. Marriott Int'l, Inc.*,
    No. 14 CIV. 6336 (ER), 2016 WL 406384 (S.D.N.Y. Feb. 2, 2016) .. 6, 7, 14

*Watson v. Arts & Ent. Television Network*,
    No. 04 CIV. 1932 (HBP), 2008 WL 793596 (S.D.N.Y. Mar. 26, 2008),
    *aff'd,* 352 Fed. Appx. 475 (2d Cir. 2009) ..................................................... 12

## Introduction

In his opening brief on appeal, Plaintiff-Appellant Nicholas Earl demonstrated that his disability discrimination claim under the Americans with Disabilities Act was both timely and meritorious, and that he also has a plausible claim under the Rehabilitation Act. Defendant has abandoned its argument that the ADA claim is untimely, focusing instead on whether Plaintiff has plausibly pleaded that he was disabled under federal law during his employment with Good Samaritan Hospital and whether the Hospital denied him a reasonable accommodation. For the reasons set forth below, the Second Amended Complaint (SAC) asserts that Plaintiff was disabled during his employment and that Defendant denied him a reasonable accommodation, most importantly in failing to transfer him to the non-COVID-19 unit after he finished his quarantine and returned to work following his COVID infection. For these reasons, this Court should reinstate the SAC and remand this case for discovery.

### Point I

### Plaintiff was disabled under federal law
### when he worked for Good Samaritan Hospital

In his opening brief, Plaintiff argued that the physical conditions he suffered following his COVID-19 infection took place while he was still employed at the Hospital. The SAC alleges that Plaintiff (1) "has not been able to get a peaceful night's rest, since he got COVID"; (2) "has difficulty falling asleep and staying

1

asleep" and often wakes up "short of breath," often choking, with nightmares "that leave his heart racing"; (3) suffers a troublesome digestive tract with heartburn that feels like a heart attack; (4) suffers "significant shortness of breath and chest tightness" and can no longer exercise "as he once was before COVID"; (5) and suffers "a loss of his ability to smell and taste." (Pl. Br. at 17) (citing JA 65-67, 69 ¶¶ 2(b), 3, 4(a)(b), 10). Drawing all inferences in Plaintiff's favor, he lost these sensory abilities and experienced these physical conditions while he was still working at the Hospital. These were not, as the district court held, merely "long-term effects resulting from his COVID infection" that bore no temporal relationship with his employment at the Hospital. (JA 115).

Defendant argues that Plaintiff has not plausibly pled that the above symptoms arose during his employment with the Hospital, noting that Plaintiff resigned his position only nine days after he returned to work following his quarantine and, even then, Plaintiff had only worked at the Hospital for two days during that period. (Def. Br. at 16-17). Defendant is not viewing the allegations in the light most favorable to Plaintiff's position. Plaintiff alleges that the COVID-related symptoms began "since he got COVID" (JA 65 ¶ 2(b)), "[a]fter catching COVID" (JA 66 ¶ 3), "after his battle with COVID" (JA 66 ¶ 4(a)), and post-quarantine, "[h]e had wrenching flu for more than two weeks and still has Amsonia – a loss of ability to smell and taste." The inference is that Plaintiff suffered these

2

symptoms once he got COVID. Under the plausibility test, judges are required to apply "judicial experience and common sense in assessing plausibility." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 305 (2d Cir. 2022). Research has found that COVID victims lost their sense of taste and smell only a few days after contracting the virus.[1] While Defendants suggest that these symptoms arose after Plaintiff resigned from the Hospital, "a court ruling on such a motion [under Rule 12] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News, LLC v. Am. Media Inc*., 680 F.3d 162, 185 (2d Cir. 2012). The court may only credit the defendant's interpretation of the pleaded facts if "the existence of alternative explanations [are] so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

Moreover, Defendant suggests that the SAC contradicts Plaintiff's argument in both asserting that he lost his sense of taste while employed at the Hospital but that he could also taste the solution for the fit test. (Def. Br. at 16-17). The SAC addresses this issue, stating that when Plaintiff took the fit test, he "had very little smell or taste." (JA 82 ¶ 78). The SAC further states that, at the time, Plaintiff "was unaware that he had lost smell to the extent that he had." *Id*. at n.3. What

_____

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7833280/

3

little sense of smell and taste remained caused all food to "taste like poison," diminishing Plaintiff's appetite and causing significant weight loss. (JA 64 ¶ 1(c)); *see also* JA 69 ¶ 12 ("When he eats, it feels to him as if he is eating nothing"). While Defendant argues that Plaintiff's memorandum of law on the motion to dismiss stated that Plaintiff "still had his smell at the time" (Def. Br. at 17) (citing Dkt. No. 43, at 6), in full, Plaintiff stated, "After returning to work, he tried to participate in a fit test. [JA 75, 81] ¶¶ 33, 66. However, the N95 mask the tester chose for him kept falling off his face. He still had his smell at the time, ¶¶ 33, 66, but soon after that began to suffer anosmia – loss of his olfactory senses. [JA 69, 82] ¶¶ 12, 78." Dkt. No. 43, at 6. As Plaintiff argued in his opening brief, he is not required to assert that he had no sense of taste or smell at the time. Plaintiff only had to assert that he suffered a substantial impairment of these senses. (Pl. Br. at 18).

Finally, while Defendant notes that the SAC alleges that had recovered from COVID while employed by the Hospital (Def. Br. at 18) (citing JA 86 ¶ 96; JA 90 ¶ 103), the SAC alleged only that he was not "coughing and sneezing anymore" when he needed a proper mask (JA 86 ¶ 96) and that while he had "recovered" from COVID in that the immediate symptoms were no longer present, he was now substantially limited in major life activities. (JA 90 ¶ 103).

4

## Point II

### The SAC properly alleges that Plaintiff's post-COVID symptoms substantially impaired major life activities

Plaintiff asserts that the following conditions substantially impaired major life activities: the loss of smell and taste (JA 64 ¶ 1(c)), sleeping (JA 65 ¶ 2(b), mental clarity (*id*. at 2(a)), and breathing. (JA 66 ¶ 4(a)). Plaintiff has also had a serious kidney condition since birth. (JA 67 ¶ 5). Defendants cannot demonstrate that Plaintiff has not sufficiently pleaded that these conditions have substantially impaired major life activities.

As Plaintiff argued in his opening brief, in rejecting the Supreme Court's interpretation of the Americans with Disabilities Act, the amended ADA altered the standard governing protected disabilities and makes it clear that "the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Hamilton v. Westchester County*, 3 F.4th 86, 92 (2d Cir. 2021). "The ADAAA instructs that '[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA,' and 'is not meant to be a demanding standard.'" (*Id*.) (quoting 28 C.F.R. § 35.108(d)(1)(i)).

**A. Plaintiff's loss of taste and smell**.

Defendant argues that Plaintiff's loss of taste and smell is not a substantial limitation on a major life activity because Plaintiff has not alleged that "such

5

symptoms substantially limited his 'ability to eat and digest food.'" (Def. Br. at 19) (quoting JA 116 [district court ruling]). In his opening brief, Plaintiff cited *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 918 (7th Cir. 2001), which stated that "the ability to eat is integral to one's daily existence. (Pl. Br. at 20). *Lawson* cites *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144 (2d Cir. 1999), where this Court held that "the district court did not err by assuming that some, if not all, residents of the Facility would suffer from a disability, in that they would have 'a physical or mental impairment' that 'substantially limits' one or more 'major life activities' such as bathing, dressing, toileting, and eating." *Id*. at 151. Defendant tries to distinguish *Lawson* in stating that, unlike the diabetic in that case, Plaintiff was not required to carefully monitor his food intake to avoid "potentially life-threatening" symptoms. (Def. Br. at 20). Yet, *Lawson* did not hold that plaintiffs must come forward with similar evidence to prove they have a disability under the ADA. Defendant also overlooks how, in *Forest City*, this Court also recognized that eating is a major life activity under federal law.

In support of their argument that Plaintiff's inability to eat is not a disability under the ADA, Defendants cite nonbinding, distinguishable cases. In *Telemaque v. Marriott Int'l, Inc.*, No. 14 CIV. 6336 (ER), 2016 WL 406384 (S.D.N.Y. Feb. 2, 2016), the district court held that "Plaintiff's avoidance of alcohol and high-sodium food does not interfere with his ability to eat or digest; it evinces only a

6

commonsense diet. These 'dietary restrictions, unaccompanied by any 'impairment to his ability to eat and digest food,' simply do not rise to a substantial level.'" *Id*. at \*8 (citing *inter alia Batac v. Pavarini Const. Co.*, No. 03 Civ. 9783 (PAC), 2005 WL 2838600, at \*7 (S.D.N.Y. Oct. 27, 2005) ("Since Plaintiff's dietary modifications merely restricted his ability to eat certain foods, Plaintiff's diet did not substantially impair the major life activity of eating")). Defendant also cites *Shields v. Robinson-Van Vuren Assocs., Inc.*, No. 98 CIV 8785 (DLC), 2000 WL 565191 (S.D.N.Y. May 8, 2000), which held that "Shields's assertions as to the modifications he must make to his diet and eating habits are insufficient to create a genuine issue of fact as to whether he was substantially limited in the major life activity of eating. Shields suffers no impairment to his ability to eat and digest food, and a dietary modification does not constitute a restriction 'as to the condition, manner or duration under which an individual can perform' the activity of eating. Nor are the asserted modifications severe enough to be considered by any reasonable factfinder as substantially limiting." *Id*. at \*5 Unlike the plaintiffs in *Telemaque* and *Shields*, Plaintiff is not restricted in eating certain foods or placed on any dietary restrictions; rather, he is substantially limited in his ability to eat any foods because they taste like poison.

7

**B. Plaintiff's inability to sleep.**

Plaintiff's inability to sleep is characterized by waking up short of breath and "nightmares that leave his heart racing." (JA 65 ¶ 2(b)). Defendant argues that his "unvarnished assertions do not plausibly evince a *substantial limitation* on his ability to sleep." (Def. Br. at 21) (emphasis in original). Yet, if Plaintiff is "often" waking up "almost choking" and out of breath (JA 65 ¶ 2(b)), then he is substantially limited in the major life activity of sleeping, at least for purposes of pleading a plausible claim under federal law.

In support of its argument that Plaintiff does not have a protected disability, Defendant cites *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635 (2d Cir. 1998), which states that "Colwell's evidence on this point was that he takes a medication as a sleep aid and that 'I usually get a tough night's sleep.' Difficulty sleeping is extremely widespread. Colwell made no showing that his affliction is any worse than is suffered by a large portion of the nation's adult population. He failed to establish that the degree of limitation he suffers is substantial." *Id*. at 644. Not only does *Colwell* predate the amended ADA, which broadens the definition of "disability," but Plaintiff's allegations are worse than those alleged in *Colwell*.[2]

_____

[2] Courts in this Circuit have held that cases that predate the amended ADA have reduced precedential value on the issue of whether the plaintiff has a protected disability. *See e.g. Rios v. Core Facility Servs. LLC*, No. 16 CV 1748 (CBA) (JO),

8

While this Court in *Colwell* stated that "difficulty sleeping is extremely widespread," that does not mean that "a large portion of the nation's adult population" often wakes up "almost choking" and out of breath. This Court has also emphasized that *Colwell* does not state a categorical rule and that a "fact-specific inquiry" is warranted. *Parada v. Banco Industrial De Venezuela, C.A.*, 753 F.3d 62, 69 (2d Cir. 2014). Fact-specific inquiries are more suitable on a motion for summary judgment or post-trial (such as in *Colwell*) and not on a motion to dismiss.

Defendant relies on *Sykes v. N. Fork Bank*, No. 07-CV-1102 (FB) (WDW), 2009 WL 5042531 (E.D.N.Y. Dec. 16, 2009), which held that waking up "after a few hours every night . . . even though [Plaintiff] has been prescribed sleeping medication," does not demonstrate he was substantially limited in his ability to sleep. *Id*. at *2. *Sykes* in turn applied the holding in *Colwell*, which as demonstrated above predates the amended ADA. Like *Colwell*, *Sykes* is a summary judgment case, not a ruling on a motion to dismiss. Unlike *Mazzocchi v. Windsor Owners, Corp.*, 204 F. Supp. 3d 583 (S.D.N.Y. 2016), which held that plaintiff did not adequately detail how the inability to sleep was a protected ADA disability, *id*.

---

2018 WL 1545684, at *17 (E.D.N.Y. Mar. 29, 2018), and *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 574 (S.D.N.Y. 2014).

at 612, Plaintiff alleges that, ever since got COVID-19, he "has not been able to get a peaceful night's rest," wakes up "almost choking," and has nightmares that revolve around hospital settings and his own death from COVID-19. (JA 65-66 ¶ 2(b)). *Cain v. Mandl Coll. of Allied Health*, No. 14 CIV. 1729 (ER), 2017 WL 2709743 (S.D.N.Y. June 22, 2017), which held the plaintiff (1) asserted in conclusory fashion that her PTSD substantially limited any major life activity, and (2) did not state the duration, frequency or severity of her condition, *id.* at *4, is similarly distinguishable.

**C. Plaintiff's brain fog, memory loss, and breathing difficulties.**

Plaintiff's allegations also demonstrate that he began suffering brain fog and memory loss post-COVID-19, as he "finds it arduous to concentrate" and his memory loss makes him feel like his brain is turning to "mush." (JA 65 ¶ 2(a)). Contrary to Defendant's argument, it is no stretch for Plaintiff to assert on appeal that the lack of sleep has impaired his ability to concentrate or affected his memory. *See* Def. Br. at 22 n.9. Sleep deprivation affects memory and the ability to concentrate.

The decreased lung capacity that has afflicted so many COVID victims fell upon Plaintiff, who has shortness of breath and chest tightness. (JA 66 ¶ 4(a)). As Plaintiff argued in his opening brief, breathing is a major life activity under the ADA. (Pl. Br. at 22) (citing *Shine v. New York City Hous. Auth.*, No. 19-CV-04347

10

(RA), 2020 WL 5604048, at *7 (S.D.N.Y. Sept. 18, 2020)). As Plaintiff alleges that "his lungs feel restricted after a shallow inspiration" and he can no longer exercise as he had in the past (JA 66 ¶ 4(a)), his allegations are not conclusory. In context, Plaintiff sufficiently alleges a disability under the ADA. While Defendants cite *Rogers v. City of New York*, 345 Fed. Appx. 201 (2d Cir. 2009), in claiming that "shortness of breath" during physical activity "is not a substantial limitation of a major life activity" (Def. Br. at 23), this Court stated as such "in the circumstances alleged." 345 Fed. Appx. at 203. The language in *Rogers* demonstrates the fact-specific nature of this inquiry.

Defendants' other cases on breathing limitations are also inapposite. In *Butterfield v. New York State*, No. 96 Civ. 5144 (BDP) (LMS), 1998 WL 401533 (S.D.N.Y. July 15, 1998), the district court held that "limitations on plaintiff's ability to run" are not relevant to whether the plaintiff's breathing difficulties gave rise to an ADA claim. *Id*. at *9. But in context, this case does not help Defendant. The trial court stated, "The fact that he 'periodically' has had trouble breathing, or has had trouble running, taking 'extended' walks, or lifting 'great' amounts of weight, simply does not, as a matter of law, constitute a sufficiently substantial limitation to allow his case to go to the jury on this point." (*Id*.) Unlike the plaintiff in *Butterfield*, Earl is not claiming any disability based on morbid obesity, and Earl further asserts that he generally suffers "shortness of breath," not just when he

11

exercises. (JA 66 ¶ 4(a)). Unlike the plaintiff in *Watson v. Arts & Ent. Television Network*, No. 04 CIV. 1932 (HBP), 2008 WL 793596 (S.D.N.Y. Mar. 26, 2008), *aff'd,* 352 Fed. Appx. 475 (2d Cir. 2009), Plaintiff is not claiming that his disability stems from "the need to walk slowly and the inability to walk long distances or for long periods of time." *Id*. at *12. Nor is Earl claiming, like the plaintiff in *Johns-Davila v. City of New York*, No. 99 CIV 1885 (RMB) (AJP), 2000 WL 1725418 (S.D.N.Y. Nov. 20, 2000), "that exercise is a major life activity." *Id*. at *6. Rather, Earl's inability to exercise is a manifestation of his breathing difficulties, an everyday hardship that falls within the ADA's protections.

### D. Plaintiff's kidney disease.

Finally, Defendant challenges Plaintiff's argument that his preexisting kidney disease is a disability under the ADA, claiming that Plaintiff "failed to point to any substantial limitations resulting from" this condition, "much less limitations that actually occurred while he was employed with Good Samaritan for the brief period following his COVID infection." (Def. Br. at 28). But Plaintiff alleges that he "has been fighting chronic kidney disease since birth" (JA 67 ¶ 5), and following his COVID-19 diagnosis, two urine samples revealed protein, a critical factor in analyzing the risk of further deterioration of this organ. (*Id*.) COVID-19 has "accelerated the progression of his kidney disease." (*Id*.) This is not a minor health issue, as Defendant suggests (Def. Br. at 30), but a daily

constant for Plaintiff, as his kidney disease substantially impacts the major life activity of eating certain foods, filtering nutrients from the bloodsteam, and eliminating waste. (JA 90 ¶ 104). Defendant largely ignores this allegation, claiming in a footnote that this "formulaic" allegation is conclusory. (Def. Br. at 29 n.13). But in this Rule 12 context, Defendant does not explain how much additional detail is needed to allege this health condition substantially impacts a major life activity.

In challenging Plaintiff's kidney disease argument, Defendant relies on a case that merely cited the elements of the statute in claiming the plaintiff's "periodontal disease caused 'anxiety and infection' and prevented her from 'adequately communicating, sleeping, eating, reading, thinking, concentrating and interacting with others.'" *Dancause v. Mount Morris Cent. Sch. Dist.*, 590 Fed. Appx. 27, 28 (2d Cir. 2014). Earl does not merely recite the statutory elements. Rahter, he alleges how his kidney condition has affected his daily life. *See* JA 90 ¶ 104. While Defendant notes that the cases in Plaintiff's opening brief may involve plaintiffs with advanced kidney disease, involving dialysis and end-stage renal disease (Def. Br. at 30-31) (citing *Gilbert v. Frank*, 949 F.2d 637 (2d Cir. 1991), and *Fiscus v. Wal-Mart Stores, Inc*., 385 F.3d 378 (2d Cir. 2004)), nothing in these cases suggests those physical conditions represent the minimum standards for asserting a protected disability. Moreover, *Gilbert* – decided prior to the amended

13

ADA – notes that "[t]he [Rehabilitation] Act and the regulations promulgated under it are to be interpreted broadly." 949 F.2d at 641. *Fiscus* broadly notes that "processing and eliminating waste from the blood qualifies as a major life activity because, in their absence, death results. In this respect, waste elimination is comparable to other life-sustaining activities such as breathing, eating, or drinking, all of which have been held to be major life activities within the statute." 385 F.3d at 384. That language demonstrates that Plaintiff has a disability under federal law. The district court cases in Defendant's brief on this issue do not involve kidney disease and are thus not useful. *See* Def. Br. at 30 (citing *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154 (S.D.N.Y. 2020), *Telemaque v. Marriott Int'l, Inc.*, No. 14 CIV. 6336 (ER), 2016 WL 406384 (S.D.N.Y. Feb. 2, 2016), and *Dean v. Westchester Cnty. P.R.C.*, 309 F. Supp. 2d 587 (S.D.N.Y. 2004)).

**Point III**

**Plaintiff plausibly asserts that Defendant denied him a reasonable accommodation**

"An employer may . . . violate the ADA by failing to provide a reasonable accommodation. A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of

14

the job at issue; and (4) the employer has refused to make such accommodations." *McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013).

The Complaint alleges that Defendant denied Plaintiff a series of reasonable accommodations. First, after Plaintiff told his supervisors, Megan Hanys and Marie Van DeVere, that his chronic kidney disease made it risky to work with a patient who appeared to suffer from COVID-19 (JA 79 ¶¶ 51-54, 57), he searched the Hospital on his own to find a mask that proved inadequate (*id*. at ¶ 55), and he soon tested positive for COVID. (JA 81 ¶ 63). While Plaintiff was out on quarantine, he was denied a powered air purifying respirator (PAPR) for his return to work and told to "just get fit tested again" even though he was unable to do so since he had lost his sense of taste and smell. (JA 82 ¶ 78). Even during these early days of COVID-19, it was understood at the Hospital that those recovering from COVID would at a minimum be suffering short-term disabilities arising from this infection. While Defendant argues that the Hospital was unaware at this time that Plaintiff was even suffering any health conditions that required him to avoid potential COVID infection and to have appropriate protection against this disease (Def. Br. at 25), Plaintiff told his manager, Hanys, that he has chronic kidney disease (JA 79 ¶ 52; *see also* JA 69 ¶ 11; JA 70 ¶ 14), and his occupational health nurse at the Hospital said Plaintiff could not take care of critical patients without a proper mask. (JA 84 ¶ 88).

15

When he returned to work, Plaintiff was given a faulty N95 respirator, which slipped off his face (JA 81 ¶ 67), and he was denied an appropriate mask after his supervisor, Adrianne, accused Plaintiff of playing games in requesting proper protection. *Id*. at ¶¶ 68-71. When an occupational health nurse asked Plaintiff's supervisor if he could work in the non-COVID-19 unit, a position for which Plaintiff was qualified, Adrianne rejected that solution, stating, "He's a critical care nurse." (JA 83 ¶¶ 80-83). Plaintiff next resigned his position to avoid another COVID-19 infection. (JA 84 ¶¶ 84-85).

In claiming that Plaintiff has not plead a plausible accommodation claim, Defendant argues disputed facts. While Defendant argues that it could not provide Plaintiff a PAPR in the early days of the COVID-19 pandemic because none were available (Def. Br. at 31), Plaintiff alleges that the Hospital told him that he could not have a PAPR because it lacked batteries and cartridges, which the Hospital easily could have obtained. (JA 70-71 ¶ 15). While Defendant notes that it gave Plaintiff an N95 respirator when he returned to work (Def. Br. at 31), as noted above, that mask kept slipping off his face. The Complaint does not concede that accommodating Plaintiff in providing proper protection would have created an undue hardship. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) ("A disabled employee may make out a *prima facie* case under the ADA if she shows either that she can perform the essential functions of the job without

16

accommodation or that she can do so with reasonable accommodation and that the employer refused to make such an accommodation. The employer may defeat the *prima facie* case, however, by demonstrating that making the proposed accommodation would result in undue hardship"). Defendant excuses its failures by arguing that prevailing guidance at the time suggested that COVID-19 victims were unlikely to get infected again. (Def. Br. at 32). But that argument relies on facts outside the Complaint and is better suited for discovery and the summary judgment motion.

Defendant also attacks Plaintiff's claim that it could have transferred him to the non-COVID-19 unit, a safer option for Plaintiff, whose kidney disease placed him at risk for serious health consequences in the COVID unit. Under Defendant's analysis, Plaintiff has not alleged that such a transfer was feasible or that any vacancy existed. But the Complaint asserts that in this rapidly-evolving work environment, necessitated by the COVID-19 crisis, the Hospital had just opened a unit for non-COVID patients. (JA 83 ¶ 81). In this context, this is not a case where the plaintiff seeks a transfer to a position for which there is no vacancy, resulting dismissal. The Hospital was moving patients around and presumably reallocating its resources to deal with COVID. As Plaintiff alleges, "there were other jobs of lesser risk to Plaintiff [for which] he was qualified," and he "easily could have been transferred." (JA 83 ¶¶ 82-83). Plaintiff was not told that no vacant position

17

existed; rather, he was told that he did not belong in the non-COVID-19 unit because he was a critical care nurse. (JA 83 ¶ 82). Despite that rigid justification, Plaintiff plausibly asserts that Defendant could have transferred him because he was qualified to work in safer units. (JA 83 ¶ 83).

That Plaintiff has not affirmatively asserted that a vacancy existed for him is no basis to dismiss the case. Defendant did not initiate the interactive process in good faith. Rather, it rejected his transfer proposal out of hand. (JA 83 ¶ 82). Fearful of contracting COVID-19 again and suffering additional, serious health issues, Plaintiff immediately resigned to avoid the toxic work environment (JA 84 ¶¶ 84-85), and he was therefore in no position to confirm whether any vacancies existed. Apart from the fact that the Hospital was presumably moving employees around the building at the time to staff the non-COVID-19 unit, the presence or absence of any vacancies is an issue for discovery.

Defendant further argues that Plaintiff's "own pleading affirmatively stated that Good Samaritan sought to retain him in the ICU because was a 'critical care nurse' and was needed to care for the critically ill patients housed there." (Def. Br. at 26) (citing JA 83 ¶ 82). But the fact that Plaintiff quoted his supervisor saying this does not mean that Plaintiff concedes that his supervisor had a legitimate reason to deny the transfer. The thrust of Plaintiff's Complaint is that the Hospital's bad faith refusal to keep him away from the ICU violated federal law

18

because the Hospital was able to accommodate his disability. Relatedly, while Defendant suggests the Hospital "harbored no concern whatsoever about having Appellant care for vulnerable individuals following his COVID-19 infection" because it placed Plaintiff in that location after he returned to work from his quarantine (Def. Br. at 26), that argument assumes the Hospital made this decision in good faith. Yet, the Complaint alleges that Plaintiff's supervisors were indifferent to his well-being when COVID placed him at risk because of his pre-existing kidney disease. *See* Pl. Br. at 3-5.

19

## Conclusion

As the SAC states a plausible cause of action for disability discrimination under the Americans with Disabilities Act and the Rehabilitation Act, this Court should vacate the district court's Rule 12 dismissal and remand this case for discovery.

Dated: May 9, 2023

Respectfully submitted,

Stephen Bergstein

Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277
Counsel for Plaintiff-Appellant

## Certification

Stephen Bergstein, counsel for Plaintiff-Appellant, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is 14 point. The brief contains 4,632 words.



Stephen Bergstein

21